## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| MSI REGENCY LTD,<br>8139 Beechmont Avenue<br>Cincinnati, Ohio 45254, | : Case No. ___1:07-CV-900___<br>:<br>: (Judge ___Beckwith___) |
| Plaintiff, | : |
| | : |
| vs. | : **VERIFIED COMPLAINT** |
| | : **WITH JURY DEMAND** |
| ALVIN D. JACKSON M.D., | : **ENDORSED HEREON** |
| Director of Health | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
| | : |
| and | : |
| | : |
| J. NICK BAIRD M.D. | : |
| Former Director of Health | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
| | : |
| and | : |
| | : |
| CHRISTINE A. KENNEY | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
| | : |
| and | : |
| | : |
| JODI GOVERN | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
| | : |
| and | : |

|  |  |
|---|---|
| MARTIN L. KING | : |
| 2049 Decker Court | : |
| Columbus, Ohio 43235-2046 | : |
|  | : |
| and | : |
|  | : |
| JOHN A. HOFFMAN | : |
| 1020 Mueller Drive, #A | : |
| Reynoldsburg, Ohio 43068-9106 | : |
|  | : |
| and | : |
|  | : |
| JOEL KAISER | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
|  | : |
| and | : |
|  | : |
| MADELYN DILE | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
|  | : |
| and | : |
|  | : |
| REBECCA MAUST | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
|  | : |
| and | : |
|  | : |
| CAROL RAY | : |
| Ohio Department of Health | : |
| 246 North High Street | : |
| P.O. Box 118 | : |
| Columbus, Ohio 43216-0118 | : |
|  | : |
| Defendants. | : |

## PARTIES AND JURISDICTION

1.      Plaintiff, MSI REGENCY Ltd. ("Regency"), is a limited liability company organized under the laws of the State of Ohio, with its offices located in Cincinnati, Ohio.  Akiva Wagschal is the managing member of Regency.

2.      Defendant, Alvin D. Jackson, M.D., is the current Director of the Ohio Department of Health ("ODH"), and is sued in his official capacity, and only in connection with plaintiff's request for equitable relief.

3.      Defendant, J. Nick Baird, M.D. was the Director of ODH at all times pertinent to this complaint, in whose name ODH imposed a series of administrative actions against plaintiff that are the subject of this lawsuit.  He is being sued personally for his misconduct under color of law.

4.      Administratively ODH is divided into several divisions, and one of these Divisions is the Division of Quality Assurance.  The Bureau of Diagnostic Safety and Personnel Certification is a part of the Division of Quality Assurance, and one of the sections within this Bureau is the Certificate of Need ("CON") Section.

5.      Defendant, Christine Kenney, was at all times pertinent hereto the Chief of the CON Section.  She is sued personally for her misconduct under color of law.

6.      Defendant, Jodi Govern, was at some times pertinent hereto the Chief of the Bureau of Diagnostic Safety and Personnel Certification and she is sued personally for her misconduct under color of law.

7.      Defendant, Martin L. King, was at some times pertinent hereto the Chief of the Bureau of Diagnostic Safety and Personnel Certification, before Jodi Govern, and he is sued personally for his misconduct under color of law.

3

8.     Defendant, Carol Ray, was at all times pertinent hereto the Assistant Counsel to the Director of ODH and she is sued personally for her misconduct under color of law.

9.     Defendant, Rebecca Maust, was at all times pertinent hereto Chief of the Division of Quality Assurance.  She is sued personally for her misconduct under color of law.

10.     Defendant, Madelyn Dile, was at all times pertinent hereto Assistant Chief of the Division of Quality Assurance.  She is sued personally for her misconduct under color of law.

11.     Defendant, John A. Hoffman, was at all times pertinent hereto the Senior Health Care Analyst in the CON Section, and is sued personally for his misconduct under color of law.

12.     Defendant, Joel Kaiser, was at all times pertinent hereto the Policy Analyst in the CON Section, and is sued personally for his misconduct under color of law.

13.     This court has jurisdiction over this action under 28 U.S.C Sections 1331 and 1343(3) in that plaintiff's claims arise under the Fifth and Fourteenth Amendments of the Constitution of the United States and under the Civil Rights Act of 1871, 42 U.S.C. Section 1983.  Venue is proper in this court pursuant to 28 U.S.C. Section 1391(b)(2) since a substantial part of the events giving rise to the claim occurred in the district, and the property that is the subject of this action is situated in the district.

14.     This court has pendant jurisdiction over this action under 28 U.S.C Sections 1337(a).

15.     This is an action for prospective injunctive relief against the current Director of ODH and to stop the ongoing violation of plaintiff's constitutional rights through continuing illegal state action by ODH.

16.     This is also an action against all defendants except the current Director of ODH, Alvin D. Jackson, M.D., to redress the deprivation by these defendants of plaintiff's rights,

privileges and immunities secured under the Fifth and Fourteenth Amendments of the Constitution of the United States and under the Civil Rights Act of 1871, 42 U.S.C. Section 1983, said deprivations being at all times under color of state law in derogation of plaintiff's rights.

## FACTS

**A.    Regency's Plans to Renovate and Replace its Nursing Home Building**

17.    On October 1, 2002 Regency purchased a healthcare complex from the debtor in possession through a Bankruptcy proceeding for $4,200,000.00.

18.    The healthcare complex is a 12 acre property located at 6550 Hamilton Avenue, North College Hill, Ohio, 45224 upon which was located a retirement community comprised of a 100-bed nursing home, 100 independent living units, 104 assisted living beds located in three separate buildings.

19.    The healthcare complex buildings were built in the 1960s and 1970s.  It did not meet current building codes and fire codes.  Because it was older than other healthcare facilities it was significantly more difficult to attract residents.  This is the primary reason why the complex was under-occupied and operated at a loss.

20.    Regency purchased the healthcare complex with a plan and intention of converting it into a profitable operation.  It planned to eliminate the independent living units and to renovate and to modernize the complex to a "state of the art" 100-bed nursing home facility and an assisted living facility.

21.    In 2003, Regency retained an architect and selected a general contractor to prepare architectural and engineering drawings for the project and developed a construction budget.

5

22.     In July 2004, Regency set out to obtain financing for the renovation project.

23.     In March 2005, Regency retained Greystone Servicing Corporation to prepare and file an application for a loan guarantee with the Department of Housing and Urban Development ("HUD").  In furtherance of this goal Regency authorized an appraisal of the property, a Phase I environmental study, an Asbestos study, soil borings, and engaged a consultant approved by HUD for architectural, engineering and construction plan review.

24.     Regency planned to execute the renovation project in two phases.  The construction of the new nursing home was to be the first phase and the construction of the new assisted living facility was to be the second phase.  Under this approach, during the first phase the independent living building was to be demolished and the new nursing home building was to be erected in that location.  Upon completion of the new nursing home building the residents from the old nursing home building and the assisted living buildings would move into the new nursing home building.  In the second phase, the old nursing home and assisted living buildings would be demolished and the new assisted living building would be erected at that location.  Upon its completion, the assisted living residents would move from the new nursing home building to the new assisted living facility.

**B.     The CON Application**

25.     As the construction plans were progressing, in June 2005 Regency prepared and submitted to ODH an application for a CON for that part of the renovation project that involved the so-called "replacement" of the 100 nursing home beds.  ODH had no jurisdiction over the assisted living part of the renovation project.  Therefore, the application did not mention the fact that the project would be in phases.  However, in response to an item in its CON application

submittal, Regency stated that the residents "will remain where they are until the renovation is completed." Defendants' misconduct will turn on their attitude to this statement.

26.     In its CON application Regency described the nursing home part of the project for which it sought approval as: "Replacement of 100 Long Term Care beds into new construction on the same campus due to facility and code deficiencies in the existing structure" Regency did not seek ODH approval for its plan of care for its current residents during the construction of the nursing home. The plan of care for residents in a nursing home is not subject to a CON review.

27.     On August 4, 2005 ODH declared Regency's CON application to be complete and issued a Notice of Completeness." Thereafter, on August 9, 2005, Regency gave a public notice of its proposed project and of its pending CON application for the project in a timely manner, as required by law, by publishing the notice in the local newspaper. The notice invited any affected person to submit a written objection to Regency's CON application within thirty days of the date of the Notice of Completeness. R.C. 3702.52(C).

28.     ODH received no written objections to Regency's CON application. Therefore, in accordance with R.C. 3702.52(C)(1), the Director was required to "grant a certificate of need for the entire project that is the subject of the application *immediately* … [if] [t]he director receives no written objections to the application from any affected person … thirty days after the director mails the notice of completeness." (Emphasis added). Therefore, in this case, the Director was required to approve Regency's CON application on or about September 3, 2005.

29.     The Director violated this mandatory requirement and delayed issuing Regency's CON by 60 days. The CON was issued on November 1, 2005. Exhibit "A."

**C.  The Financing Problem and Regency's Decision**

30.  On December 1, 2005 at a pre-loan application meeting with HUD in Columbus, Regency was advised, for the first time, that its plan to build its project in two phases was unacceptable, due to the length of time of the phased construction.  However, HUD was prepared to consider Regency's loan application as it was presented, if Regency were to erect the two buildings concurrently.

31.  Regency was faced with the following exigent circumstances in considering HUD's proposal:

   (a)  Regency did not have a viable alternative source of construction financing;
   (b)  Regency was committed to complete the construction of the nursing home in 10 months of the CON approval;
   (c)  To meet this deadline it was imperative that the forthcoming winter months be used to plan the project and to purchase all the materials and furnishings that the project would require;

Had ODH approved Regency's CON sixty days earlier, the exigency created by the onset of winter might have been less.

32.  Regency decided to proceed with the loan application as it was presented and committed to construct the two buildings to occur concurrently.

33.  A consequence of Regency's decision to consolidate the project into a single phase was that the nursing home operation and the assisted living operation would have to be discontinued for the duration of the construction project, and the residents would have to be temporarily accommodated at other appropriate facilities of their liking.

**D.  Regency's Closing of the Nursing Home and the Relocation of its Residents**

34.  The closure of a nursing home in Ohio requires the facility to provide a 90-day advance notice of the closure to the current residents, the Department of Health, Department of Jobs and Family Services and the local nursing home ombudsman organization.

35. On December 15, 2005 Regency was providing nursing facility services to 42 residents. 13 of the 42 residents were mentally alert and able to make decisions themselves. The other 29 residents were cognitively impaired. Two of them had court appointed guardians and 27 of them had a family member acting as their responsible parties who made decisions for them.

36. On December 15, 2005 Regency staff met with the mentally alert residents and informed them of the change in construction plans for rebuilding the facilities and advised them that the facility would have to temporarily close for the duration of the construction and they would need to be temporarily housed and cared for in other facilities of their choice, and offered them relocation assistance.

37. On December 15, 2005 the Regency staff gave each resident the required 90- Day Notice of Closure and mailed the required notices with an offer of relocation assistance to each resident's responsible party of record.

38. On December 15, 2005 Regency also mailed the required 90-Day notice to the Department of Health, Department of Jobs and Family Services and the local nursing home ombudsman organization. Exhibit "B."

39. During the period between December 17, 2005 and December 27, 2005 Regency's staff successfully communicated verbally, with the responsible parties of 22 of the 29 cognitively impaired residents.

40. During that period of time Regency's staff was unsuccessful in reaching 7 of the 29 cognitively impaired resident's responsible parties.

41. By December 27, 2005, 32 of the residents or their responsible parties accepted Regency's relocation assistance and either left the facility for temporary accommodations elsewhere or planned to do so at their convenience.

42.     On December 27, 2005, when Regency had received no response from the responsible parties of the 7 remaining cognitively impaired residents to its 90-day notice, Regency's staff invoked an alternate resident relocation procedure and issued an additional notice.   The additional notice was an official "30-day notice of proposed discharge from facility".  Exhibit "C."

43.     The notice of proposed discharge included the address and telephone number of the legal counsel of the Ohio Department of Health and the name and address of the local ombudsman, so that the resident or responsible party could request a hearing to appeal the discharge.  R.C. 3721.16(A)(1).

**E.     ODH Initial Reaction to Regency's Closing and Relocation of its Residents and Regency's Response**

44.     On January 6, 2006, defendant Kenney, Chief of the CON program of ODH, wrote a letter to Regency and expressed concerns that the facility's closure and resident relocation may be a violation of its CON grant and appeared to invite response.  Exhibit "D."

45.     Had the January 6 letter specifically ordered Regency to cease and desist from continuing with the closure of the facility and to invite the relocated residents to return, Regency could have done so to safeguard its CON.

46.     On January 10, 2006, Wagschal drafted a written response on Regency's behalf and reviewed it with John Hoffman from the CON program.   Hoffman suggested some additional language, which Wagschal incorporated into the response.   Hoffman advised Wagschal to distribute the response to a long list of people including the ODH legal counsel, Carol Ray.

47.     On January 11, 2006 Wagschal spoke with Carol Ray.  She told him that she was unaware of Kenney's January 6, 2006 letter and that, generally, letters threatening the status of a

CON are reviewed by the legal counsel.  She further told Wagschal that the concerns that Kenney expressed in her January 6 letter were unprecedented and suggested to Wagschal to send his response only to Kenney.  Wagschal followed Ray's advice.

48.  On January 11, 2006 Regency faxed its response to Kenney's January 6 letter to ODH and emailed copies of all the notices in regard to the closure to Carol Ray.  Exhibit "E."

49.  Hearing nothing from ODH, Regency continued to help its residents relocate until January 25, 2006 when no residents were left in the facility.  At that time the facility was deemed closed, and Regency issued the required notice to this effect.  Exhibit "F."

50.  On February 2, 2006 Kenney sent Regency a routine follow up letter requesting design drawings for the project.  This encouraged Regency to believe that ODH found its response to be satisfactory and that it can continue with the project.  Kaiser drafted this document for Kenney.  Exhibit "G."

51.  The renovation project was thus progressing satisfactorily until February 23, 2006 when ODH initiated its administrative action against Regency.

**F.  ODH Administrative Action Against Regency**

52.  On February 23, 2006 the Director issued a Reviewability Ruling in which he concluded that Regency's closing of the nursing facility and temporarily relocating the residents was a reviewable activity.  Kenney drafted this document for the Director.  Exhibit "H."

53.  On March 6, 2006 the Director imposed an administrative sanction against Regency by levying a $207,000 Civil Penalty and an additional sanction of denying Regency and certain individuals associated with Regency the opportunity of submitting other CON applications for a period of three years.  These sanctions were based upon, and justified by the Director's Reviewability Ruling.  Kenney drafted this document for the Director.  Exhibit "I."

54.     On March 6, 2006 the Director gave notice of his intention to impose an additional administrative sanction against Regency by issuing a Proposal to Withdraw CON Approval, based upon, and justified by his Reviewability Ruling.  Kenney drafted this document for the Director.  Exhibit "J."

55.     On May 15, 2006 the Director withdrew from Regency the CON approval. Kaiser drafted this document for the Director.  Exhibit "K."

**G.     Revised Code Chapter 119 Administrative Appeal Process**

56.     Regency administratively appealed each of the Director's rulings:  Reviewability, Civil Penalty and Withdrawal of CON.

57.     The three appeals were consolidated, and proceeded to an evidentiary hearing before a Hearing Examiner on December 13-14, 2006 and concluded on May 29-30, 2007.

58.     At the conclusion of the hearing the Hearing Examiner established a briefing schedule for Post-Hearing Briefs.  The last brief in this schedule is due on or before November 9, 2007.  The Hearing Examiner expects to publish his recommendation to the Director 30 days after November 9.

59.     Within ten days any party may submit objections to the Hearing Examiner's Report "which … shall be considered by the agency before approving, modifying, or disapproving the recommendation."  R.C. 119.09.  There is no set time within which ODH must issue its final ruling.

60.     Thirty days after the date the Director's adjudication order is mailed an appeal may be filed in the Tenth District of the Ohio Court of Appeals.  R.C. 3702.60(F).

**H.      Adverse Effect of Delays in Pending State Administrative Process**

61.     Before February 23, 2006, when the Director issued his Reviewability Ruling and later imposed the Civil Penalty and proposed to withdraw Regency's CON, Regency was ready, willing and able to commence the construction of its new nursing home on the Regency property.

62.     Since then Regency has been unable to proceed with the construction of its new nursing home, due to the uncertainty created by the Director's letters and orders.   This uncertainty will not be completely resolved until the appellate process is concluded.

63.     In addition to the uncertainty factor, since May 15, 2006 Regency has also been unable to construct its nursing home because ODH actually withdrew Regency's CON.

64.     As the holder of a CON Regency is required to begin construction of the new nursing home within two years of the date of issuance of the CON.  Otherwise the CON expires by operation of law in accordance with R.C. 3702.525(A).

65.     On information and belief it is alleged that ODH intends to apply R.C. 3702.525(A) to Regency's CON and deem it to expire as of November 1, 2007 even though the validity of the Director's rulings with regard to the Regency's CON are pending the conclusion of the appeal process.

**I.      Injunctive Relief**

66.     Unless this court intervenes and orders ODH to maintain the status quo as of February 23, 2006, Regency's CON will expire on November 1, 2007 and will result in irreparable harm to Regency for which there is no adequate remedy at law.

67.     There is a substantial likelihood that Regency will prevail on the merits in the appellate process.  However, it is also likely that this will happen after November 1, 2007, and by then the CON will have expired by operation of law.

68.     Even if Regency prevails on the merits, once its CON expires Regency will be unable to reapply for a CON for the same project. To be eligible to submit a CON application a facility must actively provide nursing care within twelve months before it submits its application. Since Regency closed its facility on January 25, 2006 in furtherance of its current CON, it lost its eligibility to refile on January 25, 2007.

69.     In awarding Regency its CON on November 1, 2005 ODH certified that there is a need for the proposed 100-bed nursing home in the North College Hill community. That need still exists. However, unless the court intervenes and preserves the validity of Regency's current CON pending the outcome of the state appeal process, that need will remain unmet.

70.     Regency has no adequate remedy at law. Unless the court intervenes Regency can prevail in the state appeal process but, nevertheless, still be unable to construct and operate the nursing home, because its current CON will have expired and it is ineligible to reapply for another CON. As a result, Regency's corporate identity and reputation as a nursing home builder and operator will be damaged. This will adversely affect its ability to "build on its prior successes" when it applies for other CONs, and whenever it seeks to finance other healthcare projects, among other things.

71.     Regency has no adequate remedy at law in damage against the State of Ohio. United State Constitution, Eleventh Amendment.

72.     The issuance of a preliminary injunction will not cause substantial harm to any third parties, because it will only prevent Regency's CON from expiring by operation of law.

73.     The public interest would be served by the issuance of a preliminary injunction because it will enable Regency to build the modern nursing home that is needed in North College Hill if Regency prevails on the merits in the state appeal.

**J.      The Misconduct of the Individual Defendants**

74.      In executing their administrative duties in ODH each individual defendant misconducted himself or herself under color of law in, at least, the following way:

(a)      **Kenney**, abused her position as Chief of the CON Section by:

1.      Irrevocably concluding that Regency violated its CON on or about January 5 or 6, 2006, without regard to the responses that Regency may have.

2.      Relied on false or, at best, erroneous factual information, regarding Regency's closure of the facility and the relocation of its residents, and failed to investigate the facts that were readily available to her in ODH files.

3.      Provided false factual information to others at ODH, including the Director, intending that they impose the harshest administrative sanctions against Regency, which ODH did.

4.      Misused her "expertise" by purposely misapplying and misinterpreting the CON rules and regulations in a manner that ODH had not previously done.

5.      Provided Regency no real opportunity to correct its infraction. Kenney's January 6 letter to Regency did not order Regency to stop the closing of the facility and, although it appeared to invite a written response, it actually did not.

6.      Between January 6 and February 23, 2006 misled Regency to believe that its response to the January 6 letter was acceptable and that it may continue to construct the new nursing home.

(b)      **Hoffman**, abused his position as Senior Health Care Analyst in the CON Section by conspiring with Kenney in misapplying and misinterpreting the CON rules and regulations.

(c)      **Kaiser** abused his position as Policy Analyst in the CON Section by conspiring with Kenney in misapplying and misinterpreting the CON rules and regulations.

(d)      **King**, on information and belief that he was Chief of the Bureau of Diagnostic Safety and Personnel Certification when ODH decided to administratively sanction Regency, abused his position by failing to supervise and investigate the inappropriate decisions and incorrect interpretations of member of the CON Section.

(e)      **Govern**, on information and belief that she was Chief of the Bureau of Diagnostic Safety and Personnel Certification when ODH determined to Regency is to be administratively sanctioned, abused her position by

failing to supervise and investigate the inappropriate decisions and incorrect interpretations of member of the CON Section.

(f) **Ray**, as the Assistant Counsel to the Director of ODH, abused her position by approving the Reviewability Ruling and all the sanctions that were based on this Ruling, without investigating the accuracy of the facts that formed the basis of the Ruling and by conspiring with Kenney in misapplying and misinterpreting the CON rules and regulations.

(g) **Maust**, as Chief of the Division of Quality Assurance, abused her position by failing to supervise or investigate the conduct of the staff in the CON Section, but rather "rubber-stamped" the letters that were prepared for the Director to sign, and implicitly assured the Director that the letters were appropriate for his official signature.

(h) **Dile**, as Assistant Chief of the Division of Quality Assurance, on information and belief, was a part of the decision making process in this case, but failed to provide appropriate supervision and oversight to the activities of the CON Section.

(i) **Baird**, as Director of ODH, failed to supervise and oversee the activities of the CON Section. He abdicated his responsibility and entrusted them to others, such as Kenney, King, Ray, Maust and Dile, without personally insuring that actions that were recommended to him were based on accurate facts and correct application and interpretation of the CON rules and regulations.

75. From June 2005 through February 2006, Regency planned the renovation of its nursing home with full knowledge and encouragement of the Department. Regency reasonably relied on the fact that its CON would remain valid as long as Regency did not change the project site, that it would not incur cost overruns greater than 10%, and Regency would "obligate" the project within 2 years (i.e., that it would obtain construction financing and begin actual construction).

76. In reliance on this fact, Regency did all the following, all to its detriment:

(a) Retained the services of architects and other engineers and designers, thereby incurring professional fees;

16

      (b)     Retained the services of attorneys and accountants to prosecute the CON application, thereby incurring professional fees;

      (c)     Retained financial experts and appraisers to assist with obtaining financing for the project, thereby incurring professional fees;

      (d)     Shut down its existing nursing home for more than one year, thereby irretrievably losing the right to reopen it.

## K.    Damages

77.    Because the existing Regency Nursing Home has been closed for more than 12 months, it cannot be reopened.  The actions taken by the Department have reduced the value of the Regency property to that of vacant land.

78.    The estimated time of construction for the replacement facility was ten months.

79.    It was anticipated that the new facility would attract residents and that the facility would operate at nearly 100% occupancy before the end of the first year of operation.

80.    With the facility operating at near full occupancy, it was projected that the facility would generate an annual net operating income of $2,500,000.

81.    The useful life of the replacement facility as an operation that can maintain near full occupancy and produce the above-mentioned net operating income (adjusted for inflation) is 40 years.

82.    The anticipated fair market value of the renovated facility was $18,500,000.

83.    The amount of money that Regency has invested in the purchase and maintenance of the facility as a licensed SNF in order to start development project including the nursing home part thereof is perhaps greater than $12,500,000.00.

## COUNT I

84.     Plaintiff hereby re alleges and incorporates by reference the factual allegations of paragraphs 1 through 83 of the complaint as if set out in full.

85.     Acting under color of state law, defendants engaged in a series of actions culminating in the letter of May 15, 2006, withdrawing the CON which rendered plaintiff's property nearly valueless, all in violation of 42 U.S.C. Section 1983.

86.     By engaging in the course of conduct described in this complaint, defendants conspired to deprive plaintiff of its ability to use, develop, operate and profit from the nursing home.  Accordingly, plaintiff is entitled to recover damages caused by defendants' misconduct.

87.     The action of the defendants described in this complaint constitutes an unlawful taking of property in violation of the Fifth and Fourteenth amendments of the Constitution of the United States.

88.     The action of the defendants described in this complaint constitutes an unlawful denial of equal protection as guaranteed by the Fourteenth amendments of the Constitution of the United States.

89.     The action of the defendants described in this complaint constitutes denial of due process and just compensation in violation of the Fifth and Fourteenth amendments of the Constitution of the United States.

90.     The action of the defendants described in this complaint constitutes a violation of Section 16, Article I of the Ohio Constitution, prohibiting the taking of property without due course of law.

91.     The defendants' conduct was purposeful, knowing and reckless, and was calculated to deprive Regency of its ability to use, develop and profit from its nursing home.  As

a result, defendants are liable to Regency for all compensatory damages caused by such misconduct, and for punitive damages.

## COUNT II

92.     Plaintiff hereby realleges and incorporates by reference the factual allegations of paragraphs 1 through 91 of the complaint as if set out in full.

93.     The withdrawal of Regency's CON and the imposition of the Civil Penalty were premature because they were based upon the Director's Reviewability Ruling, from which Regency appealed, and the appeal was then pending.

94.     The premature imposition of these administrative sanctions against Regency constitutes an administrative taking of plaintiff's property.

95.     Defendants have failed to pay Regency the reasonable value of the property taken.

## COUNT III

96.     Plaintiff hereby realleges and incorporates by reference the factual allegations of paragraphs 1 through 95 of the complaint as if set out in full.

97.     Plaintiff is entitled to a preliminary injunction to prevent ODH from declaring Regency CON to have expired on November 1, 2007 by applying R.C. 3702.525(A).

WHEREFORE, plaintiff, MSI REGENCY LTD., prays for the following relief:

1.      For a temporary restraining order prohibiting Alvin D. Jackson, M.D., Director of the Ohio Department of Health, or his successors, his agents or any persons acting in concert with him, from terminating Regency's CON by operation of R.C. 3702.525(A) until a hearing is had on plaintiff's application for a preliminary injunction.

2.      For a preliminary injunction enjoining Alvin D. Jackson, M.D., Director of the Ohio Department of Health, or his successors, his agents or any persons acting in concert with him, from terminating Regency's CON by operation of R.C. 3702.525(A) during the pendency of this action.

3.      On a final hearing, for an order permanently enjoining Alvin D. Jackson, M.D., Director of the Ohio Department of Health, or his successors, his agents or any persons acting in concert with him, from terminating Regency's CON by operation of R.C. 3702.525(A) during the pendency of the state appellate and judicial process.

4.      For money damages against all defendants, except Jackson, jointly and severally, as follows:

     (a)     For compensatory damages in the amount of, at least, $12,500,000.

     (b)     For punitive damages.

     (c)     For attorney's fees in the amount to be proven at trial.

5.      For costs of this action.

6.      For such other and further relief to which plaintiff may be entitled.

/s/ Simon Groner
Simon Groner  (0032116)
Attorney for Plaintiff
119 East Court Street
Cincinnati, Ohio 45202
(513) 632-9595
(513) 721-4100  FAX
sgroner@fuse.net

**JURY DEMAND**

Now comes plaintiff and hereby demands a trial by jury on all matters in the above-captioned matter.

/s/ Simon Groner
Simon Groner  (0032116)
Attorney for Plaintiff

## VERIFICATION

I, Akiva Wagschal, am the managing member of plaintiff, MSI REGENCY, LTD. I have read the foregoing Complaint for Injunctive Relief and claims under the Civil Rights Act of 1871, 42 U.S.C. Section 1983 for deprivations of constitutional rights under color of state law. I certify that all factual allegations are true of my own knowledge, except as to matters which are stated on my information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the State of Ohio the above is true and correct.

Date:  October 25, 2007          /s/ Akiva Wagschal
                                 Akiva Wagschal